IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SIEEDA BROWN,<br><br>       Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | CASE NO. 1:25-cv-1993<br><br>DISTRICT JUDGE<br>BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &**<br>**RECOMMENDATION** |

Plaintiff Sieeda Brown filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In May 2023, Brown filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of

September 29, 2022.[1] Tr. 15. In her applications, Brown claimed disability due to fibromyalgia, migraines, chronic pain, major depression, plantar fasciitis, asthma, sleep apnea, damaged right rotator cuff, anxiety, and sciatica. Tr. 267. The Social Security Administration denied Brown's applications and her motion for reconsideration. Tr. 106, 115, 123, 131. Brown then requested a hearing before an Administrative Law Judge (ALJ). Tr. 153.

In August 2024, an ALJ held a hearing, during which Brown and a vocational expert testified. Tr. 41–70. The next month, the ALJ issued a written decision finding that Brown was not disabled. Tr. 15–32. The ALJ's decision became final on July 25, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Brown filed this action on September 19, 2025. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ's finding that Plaintiff did not require the use of a cane for standing or a rollator was not supported by substantial evidence and was contrary to Social Security Ruling 96-9p.
>
> 2. The ALJ committed harmful error when he applied the wrong standard of review when he mostly adopted the residual functional capacity as set forth by the prior Administrative Law Judge.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

3. The ALJ erred when he failed to support his conclusions or discuss supportability and consistency when he evaluated the opinion of the treating rheumatologist.

Doc. 7, at 1.

**Evidence**

*Personal and vocational evidence*

Brown was 41 years old on her alleged disability onset date. Tr. 30. She completed twelfth grade and used to work as a hand packager. Tr. 59, 268.

*Relevant medical evidence*

In August 2022, Brown saw her primary care doctor, Andrew Brobbey, MD. Tr. 341. Brown reported shortness of breath with exertion and increased fatigue. Tr. 341. Dr. Brobbey assessed obstructive sleep apnea and commented that Brown needed her CPAP machine adjusted. Tr. 342. As for Brown's shortness of breath, Dr. Brobbey advised that Brown see her pulmonologist. Tr. 342.

In September 2022, Brown followed up with Dr. Brobbey. Tr. 347. She reported that she had been to the emergency room and given antibiotics for a urinary tract infection. Tr. 347. Brown reported hip pain and Dr. Brobbey noted that she had an injection scheduled for the following week. Tr. 347.

Brown followed up with Dr. Brobbey in October 2022 and reported itching, shoulder pain, and right-flank pain. Tr. 360. Dr. Brobbey assessed Brown with migraine without aura or status migrainosus, for which Dr. Brobbey advised Brown take her medication "as ordered." Tr. 361. Dr. Brobbey

3

assessed chronic left shoulder pain, for which Dr. Brobbey advised Brown to follow up with "ortho," and chronic pain syndrome, for which Dr. Brobbey prescribed Gabapentin. Tr. 361.

In November 2022, Brown saw Dr. Brobbey and reported shortness of breath with activity and increased leg swelling. Tr. 366. Dr. Brobbey assessed orthopnea (shortness of breath when lying flat) and chronic deep vein thrombosis of the right leg. Tr. 367. The next month, Brown told Dr. Brobbey that she had increased leg swelling despite taking a diuretic. Tr. 373. Dr. Brobbey increased Brown's diuretic dosage. Tr. 376.

In January 2023, Brown saw a certified nurse practitioner from Dr. Brobbey's office and reported fatigue, shortness of breath with exertion, dizziness, and anxiety with panic attacks. Tr. 393. The nurse noted that testing was negative for acute deep vein thrombosis. Tr. 394. The nurse adjusted Brown's anxiety medication and continued Brown's anticoagulant medication. Tr. 394.

In February 2023, Brown saw a certified nurse practitioner at Dr. Brobbey's office to follow up after an urgent-care visit the day before the appointment for chest pain and shortness of breath. Tr. 406.  Brown told the nurse that she had bruising and swelling in her feet, and that elevating her feet "helped a lot." Tr. 406. On exam, she had no edema, calf tenderness, or motor deficits. Tr. 407. She had fluent speech and a steady gait. Tr. 407. Brown declined another leg ultrasound. Tr. 406.

In March 2022, Brown told Dr. Brobbey that her legs swelled at the end of the day. Tr. 413. On exam, Brown had no joint swelling or deformity, edema, calf tenderness, or motor deficits. Tr. 414. She had a normal range of motion and a steady gait. Tr. 414. Dr. Brobbey diagnosed pedal edema and instructed Brown to wear compression stockings. Tr. 414.

On a Wednesday in early May 2023, Brown told the nurse in Dr. Brobbey's office that she had swelling and pain in her left calf "since Monday." Tr. 436. She reported being medication compliant and that elevating her leg did not help. Tr. 436. The nurse commented that Brown had edema in her legs, left greater than right. Tr. 436. She had no swelling in her joints and full range of motion, a normal gait, and no motor deficits. Tr. 436. The nurse increased Brown's diuretic dosage and commented that she "suspect[ed] [Brown] may have missed [medication] doses." Tr. 436. She ordered Brown to undergo a left leg ultrasound. Tr. 436.

Five days later, Brown visited the emergency room to undergo the ultrasound early because she couldn't stand the pain that she was experiencing. Tr. 501. She appeared to be in no acute distress and she walked with a steady gait. Tr. 501, 504. The ultrasound was negative. Tr. 504. The doctor prescribed "symptomatic care with topical diclofenac and lidocaine" and advised Brown to follow up with her primary care provider. Tr. 504.

In late May, Brown followed up with the nurse in Dr. Brobbey's office. Tr. 442. She told the nurse that she had an upcoming vascular appointment.

Tr. 442. On exam, Brown had no edema or calf tenderness. Tr. 443. The nurse commented that Brown's legs were large but proportional to "her body habitus." Tr. 442. Brown had no joint swelling or motor deficits and a steady gait. Tr. 443. The nurse assessed pain in both lower extremities and prescribed a trial of muscle relaxants. Tr. 443. She assessed Brown's fibromyalgia as stable. Tr. 443.

In June, Brown saw the nurse for swollen feet. Tr. 450. She also reported some migraines despite migraine-prevention medication. Tr. 450. On exam, Brown had no edema, joint swelling, calf tenderness, or motor deficits. Tr. 451. She had a normal range of motion in her joints and a steady gait. Tr. 451. The nurse assessed pedal edema and adjusted Brown's diuretic and migraine medications. Tr. 451.

The next day, Brown went to the emergency department complaining of pain and swelling in her legs and dizziness. Tr. 478. Brown said that she was going on a trip and wanted to make sure everything was okay. Tr. 478. On exam, she had edema in her lower legs. Tr. 480. Her swelling decreased while sitting in the emergency room and she was diagnosed with pedal edema. Tr. 481.

At Brown's June and July 2023 routine appointments at Dr. Brobbey's office, she reported headaches every other day, which she believed were related to stress—her mother was hospitalized—and the weather. Tr. 456, 475–76. The nurse discussed with Brown the importance of adequate food and water intake,

especially since Brown was taking a diuretic. Tr. 457, 476. At both visits, Brown's exam findings were normal. Tr. 457, 476.

In July 2023, a pulmonologist diagnosed Brown with restrictive lung disease, asthma, and possibly lupus. Tr. 473–74.

In August 2023, Brown returned to Dr. Brobbey's office for a routine appointment. Tr. 1583. She reported ongoing lower leg edema that improved with elevation. Tr. 1583. The nurse commented that Brown had not received her compression stockings despite having been measured. Tr. 1583. On exam, Brown had no joint swelling, edema, calf tenderness or motor deficits. Tr. 1584. She had a normal range of motion in her joints and a steady gait. Tr. 1584. The nurse assessed pedal edema. Tr. 1584.

That month, Brown completed a Function Report. Tr. 275–85. Brown wrote that her minor daughter helped her shower and sometimes dress. Tr. 276. She stated that her rheumatologist had prescribed a cane. Tr. 281.

In September 2023, Brown had a physical therapy appointment. Tr. 832. Brown complained of hip and lower back pain that interfered with her ability to rise from a chair, stand, walk more than a few minutes, and "physical activities." Tr. 836. Brown presented with impairments in her balance, gait, posture, range of motion, strength, and functional performance, which showed that she was a fall risk. Tr. 836. She said that she had "recently" started using a cane due to feeling unstable while walking and she walked with a cane during the exam. Tr. 833, 835. She tried aquatic therapy in the past but hadn't stuck

with it long enough to see if it would help. Tr. 833. The therapist recommended aquatic therapy. Tr. 833.

About two weeks later, Brown had a pain management evaluation. Tr. 821. She reported muscle pain and pain in her lower back that radiated to her left thigh. Tr. 822. Brown's "current medications" list included a rollator walker (a walker with wheels and sometimes a seat) "to assist walking as needed." Tr. 822. On exam, Brown had full lower extremity strength and sensation. Tr. 824. The doctor wrote that Brown "uses a wheeled walker for distance" and he described her gait as "awkward." Tr. 824. She had mild discomfort in her lower back, sacroiliac joints, and left hip. Tr. 824. The doctor diagnosed chronic bilateral low back pain with left-sided sciatica, diffuse myofascial pain syndrome, chronic pain syndrome, and left hip trochanteric bursitis. Tr. 824–25. The doctor wrote that Brown should continue with physical therapy, after which time he planned to re-evaluate. Tr. 825.

In October 2023, Brown saw Natalie Whitlow, Ph.D., for a psychological consultative exam. Tr. 694–702. Dr. Whitlow diagnosed Brown with adjustment disorder with depressed mood, Tr. 770, and assessed no functional limitations, explaining that none were adequately substantiated, Tr. 701–02.

In December 2023, Brown saw a physician assistant at the neurological institute and reported "pain everywhere." Tr. 783. She said that she experienced pain for five or six years which had worsened over time. Tr. 783. Brown reported trouble walking and said that she used "a walker to ambulate."

Tr. 783. She denied dizziness or leg weakness, but said that she felt that her balance was off and that she would fall. Tr. 783. On exam, Brown could rise from a seated position without assistance. Tr. 786. She had a normal range of motion in her spine and an antalgic gait.[2] Tr. 786. The provider recommended that Brown undergo Ketamine infusions and follow up four weeks after that. Tr. 786.

In January 2024, Brown told her pain management doctor that she had completed nine physical therapy sessions but experienced limited benefit. Tr. 772. At this video appointment, the doctor stated that Brown could "stand and move about the room without apparent issue." Tr. 775. She had "[n]o overt weakness or asymmetry within the limitations of the video exam." Tr. 775. The doctor assessed chronic bilateral low back pain with left-sided sciatica, diffuse myofascial pain syndrome, chronic pain syndrome, and spinal stenosis of the lumbar region. Tr. 775. He remarked that an MRI of Brown's left hip showed mild osteoarthritis and ordered a lumbar MRI. Tr. 775.

In February 2024, Brown had a virtual follow-up visit with the nurse at Dr. Brobbey's office. Tr. 1598. Brown's virtual exam indicated no joint swelling or edema and a full range of motion. Tr. 1600. The next day, a psychologist virtually assessed Brown for cognitive and behavioral group therapy focused on coping with chronic pain. Tr. 756–57. The doctor described Brown as

---

[2]    An antalgic gait is an abnormal gait due to the person trying to avoid pain. *See* Dorland's Illustrated Medical Dictionary, at 96 (33rd ed. 2020).

depressed and anxious, but she commented that Brown paid "good attention" during the session and verbalized her understanding of it. Tr. 756. She assessed Brown with major depressive disorder, general anxiety disorder, pain disorder with psychological and physical features, fibromyalgia, and chronic pain syndrome. Tr. 757.

In March 2024, Brown returned to Brobbey's office. Tr. 752. Brown reported generalized aches and pains, fatigue, and pain in her right shoulder and right knee. Tr. 752. On exam, Brown had no edema, calf tenderness, or joint swelling. Tr. 752. She had a normal range of motion and a steady gait. Tr. 752. The nurse assessed chronic pain in both knees and leg pain, for which Brown was to wear compression hose. Tr. 752. The nurse also assessed greater trochanteric pain syndrome of the left leg, chronic left hip pain, fibromyalgia, and radiculopathy in the lumbar region, and wrote that for these conditions Brown was to use a rollator. Tr. 752.

At an April 2024 visit at a spine institute, Brown said that she was using her walker and cane "as needed for gait stability." Tr. 743. She reported that her pain was unchanged and rated it eight-out-of-ten. Tr. 744. On exam, Brown had a normal gait and reflexes, normal lower extremity strength, and, in her lumbar spine, muscle spasms and decreased mobility. Tr. 748. The provider recommended that Brown re-start pain management and perform back stretches. Tr. 748.

Brown returned to physical therapy. In July 2024, the therapist wrote

10

that Brown "demonstrate[d] difficulty with sitting, rising from a chair, standing, walking, walking in the house, walking in the community, stair negotiation, physical activities, and sleeping." Tr. 922. Brown had made limited progress due to her failure to follow up since her initial evaluation. Tr. 922. She again presented with impairments in her activities of daily living, "gait, independence in exercise, overall function, strength, stress management, and symptom management that interfered with walking, stair negotiation, sitting, rising from a chair, standing, cooking, cleaning, [and] sleeping." Tr. 922. Nevertheless, she had improved to "moderate dysfunction" from "severe dysfunction." Tr. 923. The therapist gauged Brown's prognosis as "fair," due in part to her limited compliance with previous therapy. Tr. 922. On exam, Brown had "4/5" strength in her lower extremities. Tr. 924. She needed to use her arms to stand up from a seated position and she had decreased control while returning to a sitting position. Tr. 924. Brown used a cane to walk and she had an antalgic gait with a decreased cadence and lateral sway. Tr. 924.

In July 2024, Brown saw rheumatologist Anabelle Morales-Mena, MD. Tr. 1375. Brown complained of tenderness in both shoulders, hands, feet, and left upper leg. Tr. 1380. Dr. Morales-Mena assessed Brown with "[p]olyarthritis with negative rheumatoid factor," "[o]ther systemic lupus erythematosus with other organ involvement," and fibromyalgia. Tr. 1386. That day, Dr. Morales-Mena completed a medical source statement on Brown's behalf. Tr. 1579–82. She opined that Brown could perform less than a full

11

range of sedentary work and would need to elevate her legs more than half of the workday. Tr. 1580–81. Brown would need to use an assistive device for walking and standing all of the time due to imbalance and pain. Tr. 1580.

*State agency opinions*[3]

In September 2023, Lynne Torello, MD, reviewed Brown's record. Tr. 98–103. Regarding Brown's physical residual functional capacity (RFC),[4] Dr. Torello adopted "based on AR-98-4" the prior ALJ's RFC, limiting Brown to light work[5]—lifting, carrying, pushing, and pulling twenty pounds occasionally and ten pounds frequently, and sitting, standing, and walking for six hours. Tr. 103. Brown could occasionally reach overhead to the right and had postural

---

[3]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[5]     The regulations define *light work* as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

and environmental limitations. Tr. 103. In March 2024, Mehr Siddiqui, MD, reviewed Brown's record and agreed with Dr. Torello's assessment. Tr. 120.

*Hearing testimony*

Brown, who was represented by counsel, testified at the telephonic administrative hearing held in August 2024. Brown stated that she lived with her teenaged daughter. Tr. 47. She has a driver's license but no longer drives. Tr. 48. She doesn't have a car and she cannot drive long distances due to her legs and feet. Tr. 48.

When asked how her conditions had changed since 2022, Brown stated that they have gotten worse. Tr. 50. She "could barely move or hold anything or walk." Tr. 50. Her feet and legs swell and her shoulder gives out. Tr. 50. Her migraines were worse. Tr. 50. Brown said that her doctor told her that these problems were caused by lupus and arthritis. Tr. 50. For treatment, she takes medication and attends a pain program. Tr. 51. When asked how often she had migraines, Brown said that it depends. Tr. 51. She could get a migraine that lasted for days or for weeks. Tr. 55.

When asked to describe a typical day, Brown said that she goes to therapy a lot, and on days that she did not have therapy she didn't do much. Tr. 52. Her daughter helps her dress. Tr. 52. She is in pain 24 hours a day. Tr. 52. Anytime she tries to do something her legs swell. Tr. 52. Brown's daughter performed the household chores. Tr. 52. Brown went to the grocery once or twice a month but mostly had groceries delivered. Tr. 52.

When asked what prevents her from working, Brown cited her legs and feet. Tr. 53. She couldn't walk or move around and she was always tired. Tr. 53. Brown elevates her legs, which reduces her swelling, but once she gets up and moves around, the swelling returns. Tr. 53. She uses a prescribed rollator walker, which she had for about a year. Tr. 54. It kept her from falling. Tr. 54. She also needed to use it to stand from a seated position. Tr. 54–55.

The ALJ discussed with the vocational expert Brown's past work as a hand packager. Tr. 58–59. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Brown could perform Brown's past work or any other work if the individual was limited to light work with additional reaching, postural, and environmental limitations. Tr. 59–60. The vocational expert answered that such an individual could not perform Brown's past work, but listed three examples of other jobs that the individual could perform. Tr. 59–60. The ALJ asked the vocational expert to identify jobs the individual could perform if she was limited to sedentary,[6] rather than light, work. Tr. 60. The vocational expert listed three such jobs—waxer, final assembler, and bench hand. Tr. 60.

The ALJ then asked the vocational expert whether the first individual

---

[6] The regulations define *sedentary work* as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

he described, limited to light work, could still perform the jobs the vocational expert identified if the individual needed to use a cane for walking. Tr. 61. The vocational expert said that her answer would change, and that such an individual could perform the following jobs: router, sorter, and information clerk. Tr. 59, 61. She explained that these jobs could be performed while sitting or standing, and because a cane only required the use of one hand, the individual could carry an item in the other hand. Tr. 62. When asked if her answer would change if this hypothetical individual needed a walker instead of a cane, the vocational expert said that there would be no jobs for such an individual. Tr. 62–63. The ALJ asked whether such an individual with a walker could still perform any of the sedentary jobs, and the vocational expert stated that such an individual could perform the sedentary jobs that she had identified. Tr. 63.

Brown's attorney asked the vocational expert if her answer would change if the individual the ALJ had described needed to use a walker or a cane for standing and walking, rather than just walking. Tr. 64–65. The vocational expert answered that if the individual needed either assistive device for standing and walking, there were no jobs for such an individual. Tr. 64–65.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2. The claimant has not engaged in substantial gainful activity since September 29, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis of the right hip, postsurgical changes of the right shoulder, L4-5 degenerative disc disease with foraminal narrowing, obesity, migraines, asthma, fibromyalgia, obstructive sleep apnea, and lupus (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could lift and/or carry 20 pounds occasionally and 10 pounds frequently. She could push/pull as much as she could lift and/or carry. She could sit, stand, or walk about 6 hours in an 8-hour workday. She could occasionally overhead reach on the right. She could occasionally climb ramps or stairs. She could never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch, or crawl. She can never work at unprotected heights, around dangerous moving machinery, or operate motor vehicles. She cannot perform commercial driving. She requires the use of a cane for ambulation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was … 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

16

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 29, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18–31.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.   Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

17

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it

18

determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

19

### Discussion

*1. The ALJ did not run afoul of the rule in Early*

Brown argues that the ALJ erred "when he applied the wrong standard of review when he mostly adopted the residual functional capacity of the prior Administrative Law Judge." Doc. 7, at 12.

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit said that certain previous cases "clearly demonstrate that the principles of res judicata can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. The Social Security Administration adopted this ruling as Acquiescence Ruling 98-4(6). *See* SSAR 98-4(6), 63 FR 29771-01, 1998 WL 274052 (June 1, 1998).

But in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit said that "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review. There is nothing in the relevant statutes to the contrary. And res judicata only 'foreclose[s] successive litigation of the very same claim.'" *Id.* at 933 ("a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994."). The Social Security Administration rescinded Acquiescence Ruling 98-4(6) and replaced it with Acquiescence Ruling 24-1(6), effective December 2, 2024, to reflect the Sixth Circuit's *Earley* decision. *See* SSAR 24-

20

1(6), 89 FR 92992, 2024 WL 5256889 (Nov. 25, 2024).

Brown's claim covers October 4, 2022 to September 4, 2024. Tr. 15. This is a distinct period from that of Brown's previous claim, which covered the time up to October 3, 2022. Tr. 15. So Brown's current application is entitled to a "fresh look." *See Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662, at *4 (6th Cir. Mar. 20, 2024) (quoting *Earley*, 893 F.3d at 931).

At the outset of his decision, the ALJ stated that he was "not bound by the principles of res judicata" to adopt the prior ALJ decision because he found "that new and material evidence or changed circumstances have been established after the prior [ALJ's] decision dated October 3, 2022." Tr. 15–16. The ALJ therefore evaluated the evidence, gave it a "fresh look," and found that he was *not* bound by the prior ALJ's decision. Indeed, the ALJ's RFC included a limitation due to Brown's worsening condition that was not in the prior ALJ decision. *Compare* Tr. 22, 28 (current ALJ decision), with Tr. 79 (prior ALJ decision). The ALJ's decision conformed to *Earley*.

Brown argues that the ALJ applied the wrong legal standard because, she claims, the ALJ's "RFC determination [was] based on his prior determination." Doc. 7, at 13. But the ALJ is permitted to use the prior determination as a starting point. *See Earley*, 893 F.3d at 934 ("Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making"); *see also See Dennis D.*, 2024 WL 1193662, at *6 ("it is perfectly

21

acceptable for a subsequent ALJ to presume the accuracy of a prior finding ….
Presuming accuracy is not the same as treating prior findings as binding.").

Brown next contends that the ALJ erred because he "relied on the partially persuasive findings by the state agency [reviewers] even though they adopted the prior ALJ decision." Doc. 7, at 14–15. But the ALJ recognized that the reviewers adopted the prior ALJ decision. Tr. 28. The ALJ then explained that Brown's conditions "worsened and now [she] requires the use of a cane." Tr. 28. In other words, the ALJ gave a "fresh look" to the state agency reviewers' opinions and the evidence, explained his findings, and crafted a different RFC. Brown has not explained how the ALJ erred in this regard.[7]

In support of her argument, Brown cites *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415, at *4 (N.D. Ohio Mar. 29, 2021). Doc. 7, at 17; Doc. 10, at 3. But *Dilauro* is not on point. There, the "ALJ's opinion stated at the beginning that 'no new and material evidence exist[ed] to justify not adopting the [RFC] from the previously adjudicated period.'" 2021 WL 1175415, at *3. The court wrote that "[i]t is hard to imagine a clearer example of 'considering the previous [RFC finding] a mandatory starting point' for a

---

[7] In her reply brief, Brown states that "[a]ccording to Defendant the fact that the ALJ acknowledged the later submitted evidence and found that Plaintiff needed a cane established that he provided a fresh look. This analysis is incorrect and inconsistent with the ALJ's decision." Doc. 10, at 3. She continues: "In this matter, the period of time under consideration since February 23, 2022 was after the prior ALJ determination in December 2020." *Id.* Neither of the dates Brown cites appear to have any relevance to Brown's case. And she doesn't explain why she believes that the ALJ's analysis was "incorrect and inconsistent with the ALJ's decision."

22

new claim." *Id*. Here, in contrast, the ALJ found that there *was* new and material evidence and expressly stated that he was *not* bound by the earlier ALJ decision. Tr. 15. Also, the ALJ in *Dilauro* gave "great weight" to the state agency reviewers opinions even though they "preceded … the most significant developments in Plaintiff's medical history since her previous claim—her May 2017 spine surgery and her October 2017 and August 2018 mental health hospitalizations." 2021 WL 1175415, at \*4. Here, the ALJ found "partially persuasive" the state agency reviewers' opinions and expressly accounted for later evidence showing that Brown needed a cane. Tr. 28. All told, Brown has not shown that the ALJ ran afoul of the rule in *Earley*.

### 2. The ALJ did not err when evaluating Brown's cane use

Brown argues that the ALJ's finding that Brown needed a cane for walking is not supported by substantial evidence and violated Social Security rule 96-9p. Doc. 7, at 9.

If an assistive device is "not a necessary device for [a] claimant's use, it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the [device] is medically necessary." *Murphy v. Astrue*, No. 2:11-cv-114, 2013 WL 829316, at \*10 (M.D. Tenn. March 6, 2013) (citations omitted). To be *medically necessary*, the record must reflect "more than just a subjective

23

desire on the part of the plaintiff as to the use of a[n] [assistive device]." *Id.* (citation omitted). And there must be medical documentation "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." Soc. Sec. Ruling 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996); *see Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("a cane prescription [that] does not indicate 'the circumstances for which [the cane] is needed,' … does not fulfil the requirements under SSR 96-9p"), *report and recommendation adopted*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019).

The ALJ found that Brown needed a cane for walking. Tr. 22. Brown challenges two aspects of this finding: that (1) Brown needed a cane, rather than a rollator or walker, and (2) Brown needed an assistive device only while walking, rather than while standing and walking. Doc. 7, at 9. Relatedly, Brown also challenges the ALJ's evaluation of Dr. Morales-Mena's opinion. *Id.* at 20.

The ALJ evaluated Dr. Morales-Mena's opinion as follows:

> On July 17, 2024, Anabelle Morales-Mena, M.D. completed a questionnaire in which she stated that she saw the claimant every three months since August of 2022 (Ex. B12F/1). She was diagnosed with lupus, rheumatoid arthritis, and fibromyalgia. Her symptoms were low grade temperature, fatigue, brain fog, shortness of break, atypical chest pain, joint pain and swelling, weakness, tingling, depression, and anxiety. She had impending fusion treatments. She would need a cane or hand-held

24

assistive device for walking and standing all of the time due to imbalance and [pain] (Ex. B12F/2). She would be able to use her hands bilaterally for twisting, fine manipulation, reaching in front of her body, and reaching overhead less than 25% of the time. She could rarely lift and carry 10 pounds and occasionally lift and carry less than 10 pounds. She would be off-task 25% of the workday. She would be incapable of even "low stress" work. She could sit 10-15 minutes at one time and stand 10-15 minutes at one time (Ex. B12F/3). She could sit less than two hours total in an 8-hour workday. She could stand/walk less than 2 hours total in an 8-hour workday. She would need to take frequent unscheduled breaks during the work day. She would need to elevate her legs to greater than 90 degrees, for more than 50% of the workday. She would be absent from work more than four days per month (Ex. 12F/4). She would need to avoid loud noises, fumes, gases, dust, cold air, and temperature extremes. This opinion was partially persuasive only to the extent that the record supported that the claimant's physical impairments worsened and she had more pain and that she would need a cane for ambulation. However, Dr. Morales-Mena's opinion was given on a checklist form and was not supported by specific examination findings or diagnostic evidence. On August 30, 2023, the claimant treated with Julianna Lucas, APRN-CNP for routine follow up (Ex. B13F/1). She had ongoing lower extremity edema that improved with elevation. But she had not received her compression hose, despite being measured. Examination showed no joint swelling, and normal rotation of motion of the joints (Ex. B13F/2). There was no edema in the extremities and no calf tenderness. Further, it was inconsistent with the state agency physical consultants' opinions.

Tr. 29.

Brown argues that she was prescribed a rollator "to assist with walking as early as September 28, 2023," and that she was observed at medical

appointments to use a cane and a rollator. Doc. 7, at 11 (citing Tr. 822, 835). She doesn't say that Dr. Morales-Mena prescribed the rollator.[8] Dr. Morales-Mena's opinion doesn't say which type of assistive device Brown would need. The form Dr. Morales-Mena completed first references "the need for a cane" and then asks whether the patient "need[s] a cane or other hand-held assistive device for walking, standing or both," to which Dr. Morales-Mena answered "yes." Tr. 1580. So it's not clear whether Dr. Morales-Mena opined that Brown needed a rollator, versus a cane, nor whether the doctor's "yes" answer was to standing, walking, or both. Tr. 1580. These types of ambiguous, compound questions that elicit yes-or-no answers highlight why check-box or check-list forms are disfavored. And it is true, as the ALJ observed, that Dr. Morales-Mena's check-list form wasn't "supported by specific examination findings or diagnostic evidence." Tr. 29. This is an appropriate reason to discount opinion evidence. *See Dollinger v. Comm'r of Soc. Sec.*, No. 22-3359, 2023 WL 1777386, at *4 (6th Cir. Feb. 6, 2023) (a check-box form completed by a treating source which only contained a brief explanatory note for the assessed limitations "is the kind of 'vague and unhelpful' opinion that is patently deficient and could not have been credited by the Commissioner") (citation omitted).

---

[8]    In her function report, Brown stated that Dr. Morales-Mena prescribed a cane. Tr. 281. The treatment records Brown cites showing that she had a rollator prescribed are from a pain management office, Tr. 821–22, and do not state who prescribed it. A September 2023 physical therapy treatment note indicates that Brown discussed with the therapist the "benefits of rollator vs. cane" and that Brown "request[ed] a referral from MD for rollator." Tr. 835.

Brown resists the ALJ's finding that Dr. Morales-Mena didn't support her check-list form with specific exam findings or diagnostic evidence. Doc. 7, at 20. She cites Dr. Morales-Mena's exam findings in another treatment note dated the same day. *Id.* (citing Tr. 1380). But the list of "positive" findings Brown cites in this treatment note weren't exam findings, they were Brown's reports of symptoms. Tr. 1380–81. In fact, it doesn't appear that Dr. Morales-Mena examined Brown that day. Tr. 1379–87. In any event, Dr. Morales-Mena didn't cite *in her opinion* any specific exam findings or diagnostic evidence to support her assistive-device finding, despite the form's invitation to do so.[9] *See* Tr. 1579 (form instructing the provider to "[a]ttach relevant treatment notes, radiologist reports, laboratory and test results as appropriate"); *see Chidsey v. Kijakazi*, No. 1:20-cv-1858, 2022 WL 4599195, at *10 (N.D. Ohio Sept. 30, 2022) ("Plaintiff's citations to treatment records not actually relied upon or identified by the medical source does not render the opinion 'supportable,' as the regulations specifically look to the medical source's own presentation of objective evidence and/or supporting explanations rather than a claimant's post hoc rationale."). Brown has not shown that the ALJ erred when finding unsupported Dr. Morales-Meno's opinion.[10]

---

[9] The only "clinical findings and objective signs" noted by Dr. Morales-Mena on the opinion form were untethered to any of her assessed limitations and included Brown's "elevated inflammatory markers, anemia, [illegible], [and] low vitamin D." Tr. 1579.

[10] Brown also argues that evidence supports a need to elevate her legs because she experienced leg edema. Doc. 7, at 20–21. The ALJ acknowledged

27

Next, Brown cites evidence that she believes supports her need for a rollator and for any assistive device while standing. Doc. 7, at 11. In her reply brief, she states that she "needed the walker for both standing and walking" and writes, "[e]ven the ALJ acknowledged … that [Brown] had diminished strength in her lower extremities, required the use of her bilateral upper extremities to stand, and had an antalgic gait with a decreased cadence." Doc. 10, at 2 (citing Tr. 28). But this does not show that Brown needed an assistive device while standing. Using one's arms to rise from a seated to a standing position is not the same thing as needing an assistive device while one remains standing. Brown has not cited any evidence—other than Dr. Morales-Mena's opinion, which the ALJ properly discounted—that she needed any assistive device while standing. Indeed, the reference to the rollator prescription she cites indicates that Brown was to use the rollator "to assist walking as needed." Doc. 7, at 11 (citing Tr. 822); *see also id.* (citing Tr. 835 (September 2023 physical therapy notes showing Brown used a "cane, rollator" while ambulating), and Tr. 743 (April 2024 spine institute note that Brown "has been using her walker and her cane as needed for gait stability")); *see also* Tr. 824 (doctor's note that Brown "uses a wheeled walker for distance"); Tr. 924 (physical therapy note listing Brown's "[g]ait [d]evice" as a "cane"); Tr. 783

---

that Brown at times experienced leg edema but at other times did not. Tr. 25, 27. The ALJ noted this inconsistency when discussing Dr. Morales-Meno's opinion. Tr. 29. The ALJ also remarked that Brown had not received her compression hose to treat her leg edema. Tr. 29. Brown does not challenge this finding by the ALJ.

(neurology note that Brown reported trouble walking and that she used a walker to "ambulate").

In short, Brown has cited evidence that she believes supports her need for a rollator or any assistive device while standing, but she has not shown that the ALJ's finding that she needed a cane for walking is unsupported by substantial evidence. And even if it could be said that the ALJ erred when finding that Brown needed a cane, rather than a rollator, the vocational expert testified that if so, there were several jobs at the sedentary level that Brown could perform. Tr. 60–63; *see Austin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2380, 2020 WL 9460505, at \*14 (N.D. Ohio July 7, 2020) ("[C]ourts throughout the Sixth Circuit have held that an ALJ's failure to include a use-of-a-cane limitation (which would have precluded light work) in the RFC was harmless error when the VE's testimony identified several jobs at the sedentary level that would be available to the claimant had the use-of-a-cane limitation been integrated into the RFC finding") (collecting cases), *report and recommendation adopted*, 2021 WL 1540389 (N.D. Ohio Apr. 19, 2021).[11]

---

[11]    In her reply brief, Brown says that the Commissioner's argument on this point is not supported by the hearing testimony because the vocational expert said that a hypothetical individual who needed any assistive device for standing and walking could not perform any work. Doc. 10, at 1–2. This is true. *See* Tr. 64–65. But the vocational expert testified that an individual who needed a cane or a walker for "ambulation" could perform jobs. Tr. 60–63. Both sides conflate these two restrictions, but they are separate findings. And while Brown's rollator argument is arguably stronger, since Brown was prescribed a rollator for ambulating, her argument that she needed a device to stand is not supported by the record. Brown hasn't identified any evidence other than Dr.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the

Commissioner's decision.


Dated: March 26, 2026

　　　　　　　　　　　　　　　　　　　　　/s/ James E. Grimes Jr.
　　　　　　　　　　　　　　　　　　　　　James E. Grimes Jr.
　　　　　　　　　　　　　　　　　　　　　U.S. Magistrate Judge


**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).

---

Morales-Mena's opinion that she needed an assistive device to stand, and the ALJ found that opinion unpersuasive.

30